UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MICHAEL R. STEELE,                    )
                                       )
                    Plaintiff,         )
                                       )
        vs.                            )        No. 1:16-cv-02245-LJM-MPB
                                       )
NANCY A. BERRYHILL,                    )
                                       )
                    Defendant.         )

## ENTRY ON JUDICIAL REVIEW

Plaintiff Michael R. Steele ("Steele") requests judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (the "Commissioner"), which denied Steele's applications for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1382 *et seq.* Steele alleges that the Commissioner's decision should be remanded because the presiding Administrative Law Judge ("ALJ") erred when he (1) failed to connect his residual functional capacity ("RFC") determination with respect to Steele's use of a cane to the evidence; (2) failed to explain adequately why a testifying medical expert's opinion carried more weight than that of treating and examining physicians; (3) failed to consider Steele's pain-specific concentration deficits; (4) failed to account for several impairments in his hypothetical to the Vocational Expert ("VE"); and (5) failed to consider evidence submitted by Steele's attorney after the hearing, which showed that the VE's testimony regarding the single job he testified Steele could perform was unreliable. The Commissioner denies that the ALJ erred in any way and contends that the all of the ALJ's decisions are supported by substantial evidence.

# I. __BACKGROUND__[1]

## A. PROCEDURAL HISTORY

Steele protectively filed an application for SSI benefits on June 6, 2011. (R. at 129-30) On August 22, 2011, the Disability Determination Bureau ("DDB") denied his claim. (R. at 67-70) Steele requested reconsideration, which was denied on November 18, 2011. (R. at 74-80) On December 16, 2011, Steele filed a request for an administrative hearing. (R. at 81-82)

On September 26, 2012, Steele appeared for a hearing in Indianapolis, Indiana, before Administrative Law Judge Thomas L. Wang ("ALJ Wang"). (R. at 32-64) On October 10, 2012, ALJ Wang issued an unfavorable decision, concluding that Steele's impairments permitted the performance of other work. (R. at 7-31) Steele filed a request for review by the Appeals Council, which denied his request on January 17, 2014. (R. at 14) At that point, ALJ Wang's decision became the final decision of the Commissioner.

On March 26, 2014, Steele filed a Complaint with this Court. (R. at 437-84) On March 25, 2015, following oral arguments, Magistrate Judge Baker remanded the case back to the Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g). (R. at 529-44) Specifically, Magistrate Judge Baker concluded that ALJ Wang did not adequately consider Steele's pain-specific concentration limitations. (R. at 534) Specifically, ALJ Wang assessed a mental RFC that relied on the testimony of a psychiatric expert, Dr. Cools, but inaccurately characterized Dr. Cools' opinion; therefore, ALJ Wang's opinion failed to reflect any pain-based concentration-related limitations. (R.

---

[1] Generally, the facts in this case are undisputed; therefore, the Court has relied heavily on the parties' briefs in setting forth the relevant factual background.

at 534) Dr. Cools actually testified that his assessment of mild limitations of concentration, persistence, or pace was independent of Steele's pain-related concentration limitations. ALJ Wang, however, characterized the opinion as attributing all of Plaintiff's concentration-based limitations to pain. (R. at 534) Magistrate Judge Baker wrote,

> In view of this mischaracterization of Dr. Cools' words, and the objective evidence demonstrating why the claimant suffers from severe back pain, [ ] ALJ [Wang] failed to build an accurate and logical bridge between the evidence and his conclusion that the plaintiff can sustain the mental demands of the assessed RFC. Remand is warranted for consideration of the effects this pain has on the plaintiff's ability to perform other work at Step 5.

(R. at 534)

On March 18, 2016, Mr. Steele appeared for another hearing in Indianapolis, Indiana, before Administrative Law Judge James R. Norris (the "ALJ"). (R. at 485-520) On May 11, 2016, the ALJ issued an unfavorable decision, concluding that Steele's impairments permitted the performance of other work. (R. at 437-84) Steele then timely filed a second Complaint with this Court on August 23, 2016. (Dkt. 1)

## B. AGE, EDUCATION, WORK HISTORY & STEELE'S PERCEPTION OF HIS IMPAIRMENTS

At the time of the alleged onset date, Steele was 29 years of age. (R. at 474) He has a limited education, but can communicate in English. *Id.* He had previously worked as a security officer. *Id.*

At the hearing held on March 18, 2016, Steele testified that his constant pain affected his ability to work full time. (R. at 496) He detailed his worst pain originates in his lower back area. *Id.* He reported he took Vicodin, Oxycontin, Oxycodone, and Solobrex, for the pain. (R. at 511) He stated that the lower back pain caused difficulties getting

dressed, showering, making food and tying his shoes. (R. at 496, 499) He detailed how his wife helped him with these daily tasks for several years. (R. at 496-97)

Steele also testified that he experienced difficulty when he walked due to leg numbness and back pain. (R. at 49798) He stated he could walk about a city block before needing to stop and rest, but only with his cane. (R. at 498-99) Steele detailed that he required a cane for walking, or else he would get "real unsteady" and likely fall. *Id.* He stated that he required his cane or something else to lean against in order to stand in one place. (R. at 498) Steele further testified that he needed to walk or sit after 10 minutes of standing still, because he starts to feel weak and experience cold sweats. *Id.*

Steele stated that he believed he could sit for about 30 minutes before needing to get up or adjust his position. (R. at 499) He also testified, specifically, that he was unable to bend, stoop, and crawl because of his back pain. (R. at 500) In addition, Steele stated he had difficulties holding items, was unable to lift a gallon of milk with his right arm, and was unable to lift more than a gallon of milk with his left arm. (R. at 501-02) He testified that because he needed to hold his cane with his left hand, he would be unable to carry a gallon of milk in his right hand while using the cane in his left hand. (R. at 503-04)

Steele further testified that he experienced both depression and anxiety. (R. at 510) He detailed that the depression and anxiety were related to his physical impairments. (R. at 510) He stated, "I just feel worthless." (R. at 510) Steele reported talking Palotovin for his depression. (R. at 510) He stated this medication, in addition to his pain medications, caused him dizziness, memory loss, and stomach aches. (R. at 511) He also stated his attention and concentration were now "terrible." (R. at 511-12) Steele attributed his memory loss to his constant pain. (R. at 512)

## C. RELEVANT MEDICAL EVIDENCE

### 1. Treatment Records

Steele's medical impairments date back to at least February 8, 2006, when he complained of neck pain, right shoulder pain, and numbness/weakness. (R. at 276) An MRI of his cervical spine showed mild reversal of normal cervical lordosis, mild disc bulge at C4-5, a minimal disc bulge at C6-7, and a broad-based disc bulge/disc herniation that resulted in mild flattening of the anterior aspect of the thecal sac at C5-6. (R. at 276)

On February 21, 2006, Steele saw Dr. James Cole ("Dr. Cole"), and complained of lower back pain that radiated into his buttocks and hamstrings; and numbness in his right arm with pain in his deltoid and anterior bicipital region. (R. at 286) Dr. Cole documented trace reflexes at C5, 6, and 7, in the bilateral upper extremities as well as a "slight decreased sensation in all the fingers on the right hand." (R. at 286) Dr. Cole suggested that Steele get an MRI of his lumbar spine because of his complaints of severe lower back pain. (R. at 287)

On February 28, 2006, Steele underwent an MRI of his lumbar spine. (R. at 274) The MRI showed a minimal disc bulge at L2-3; a mild disc bulge at L3-4 that resulted in some flattening of the anterior aspect of the thecal sac; mild-to-moderate facet arthritis (right greater than left) at L4-5 with posterior osteophytic spurring and flattening of the anterior aspect of the thecal sac; and severe right-sided facet arthritis with a broad-based central disc bulge at L5-S1. (R. at 274)

An MRI of Steele's neck revealed a mild reversal of normal neck curvature and a broad-based disc bulge and herniation, but no evidence of overall significant stenosis. (R. at 276-77)

With respect to his complaints regarding pain and numbness in his right arm, on March 6, 2006, Steele underwent an electromyography ("EMG"). (R. at 278) The interpreting physician reported that the study "showed that the median sensory palmar distal latency was mildly prolonged. The needle examination showed mild increased proportion of high amplitude and long duration motor units affecting mainly the triceps and EDC muscles." (R. at 278) He diagnosed "mild right C7 radiculopathy" and "right mild median neuropathy across the wrist/carpal tunnel syndrome." (R. at 279)

On March 13, 2006, Steele saw Dr. Tennyson Lee ("Dr. Lee") at the South Indy Spine Institute, for a consultation. Steele complained of right arm pain, lower back pain, neck pain, headaches, pain in the left arm, and bilateral knee pain. (R. at 291) On examination, Dr. Lee noted mild to moderate limitations in forward bending (flexion), moderately limited extension, left greater than right sacroiliac ("SI") joint loading, and right facet joint loading. (R. at 291) Dr. Lee also observed tenderness at Steele's cervicothoracic junction, over the posterior and trapezial neck muscles, over the right biceps, and diminished sensation "in the entire right arm below the axilla." (R. at 291) Dr. Lee diagnosed right-sided cervical radiculitis, SI joint dysfunction, and right facet degenerative joint disease. (R. at 291) Dr. Lee recommended an epidural steroid injection ("ESI") in Steele's cervical spine and a complete course of physical therapy. (R. at 291)

Steele immediately began physical therapy consultations. (R. at 257, 263) He complained of severe neck and back pain with pain in his right arm, as well. (R. at 257, 263) Also as recommended, Steele then met with Dr. Lee for a cervical epidural steroid injection on March 16, 2006. (R. at 284) The physician noted Steele's report that "[t]he

entire right arm is numb with pain going up to 9 to 10/10. It is worse with standing and lifting." (R. at 284) Dr. Lee documented mild to moderate tenderness at the cervicothoracic junction, moderate tenderness over the posterior and trapezial neck muscles, slight tenderness over the right facets, slight tenderness at the right biceps, and "only about 47 percent sensation in the entire right arm below the axilla." (R. at 284-85) Dr. Lee diagnosed cervical radiculopathy and administered a cervical epidural steroid injection into right C6-7 interspace. (R. at 284-85) Dr. Lee believed that Steele's MRI results did not explain his pain. (R. at 288-89)

At a physical therapy session on March 24, 2006, Steele reported experiencing worsening neck pain as well as sharp pains in his lower back with sitting. (R. at 245)

Steele returned to Dr. Lee on March 28, 2006, complaining of "circumferential numbness" throughout his right arm as well as low back pain and worsening pain, numbness, and tingling in his right lower extremity. (R. at 294) Dr. Lee observed "[a]nterior shoulder tight bands," decreased sensation throughout the right upper extremity, and "[m]oderate tight bands in the right upper lumbar supporting muscles." *Id.* He chose to continue Steele on Vicodin and Skelaxin. (R. at 295)

During another physical therapy session on April 4, 2006, Steele complained of increased numbness in his right hand and elbow as well as back and shoulder pain. (R. at 242) Steele met with Dr. Lee the next day to undergo a lumbar epidural steroid injection in hopes of alleviating his lower back pain and lumbar radiculopathy. (R. at 280) At another physical therapy session two days later, Steele complained of pain in the lower back, neck, right shoulder, and right leg. (R. at 241) He described occasional right hand

numbness, reported that he "loses [function] in R hand," and indicated the recent injection provided minimal relief. (R. at 241)

At a follow up visit with Dr. Lee on April 27, 2006, Steele complained of persistent neck pain (4/10), lower back pain radiating into the his leg (6/10), and "continued numbness in the right upper extremity. . . . He is currently off the Vicodin since he stopped working. . . . He is taking Ultram 7-8 per day with some benefit." (R. at 288) Dr. Lee observed that "he continues to have moderate tight bands in the right posterior neck and right anterior shoulder. He continues to have diffuse tenderness over the right facet, right gluteal, posterior hamstring, and calf. He reports only 50 percent sensation circumferential down the right upper extremity." (R. at 288)

On May 12, 2006, in response to his complaints of right shoulder pain, Steele underwent an MRI of his right shoulder. (R. at 264) This study produced evidence suggesting a partial/intrasubstance tear of the supraspinatus tendon as well as evidence of "some undersurface spurring off the anterior margin of the AC joint with some edema along the AC joint, consistent with degenerative change." (R. at 264) At a follow up with Dr. Lee four days later, Steele complained of pain in his right shoulder, lower back pain radiating down his right leg, and numbness in the right arm. (R. at 298) Noting evidence of a "small partial intrasubstance tear of the supraspinatus," Dr. Lee performed an unsuccessful diagnostic right shoulder injection. (R. at 298) Based on Steele's May 2006, functional capacity evaluation, (*see* R. at 265-73), Dr. Lee advised Steele to return to work, but restricted him to lifting no more than 50 pounds with "no overhead work" and "[n]o squatting, kneeling, or twisting and no climbing stairs or ladders." (R. at 296-98)

Overall, Dr. Lee opined that Steel was able to perform light to medium level work and that he was at a maximum medical improvement level. (R. at 296-98)

In the fall of 2007, Steele was treated by pain management specialist Lydia H. Ferrell, M.D., who administered epidural steroid injections into Steele's lower back. (R. at 307-08) Steele reported that he did not get any real relief from the injections. (R. at 302-03) On examination, Steele had a normal gait, full strength in both legs, normal sensation, and a full range of motion in his low back. (R. at 302-03) Dr. Ferrell recommended more injections. (R. at 302-03)

Also in 2007, Steele went to the emergency room with complaints of low back pain, but he was discharged without admission. (R. at 329)

Despite Steele's allegations of an alleged onset date in February 2010, there are no records that he received treatment from October 2007 to April 2011. (R. at 302-03, 355-57)

In April 2011, Steele went to the emergency room again with complaints of back pain; the notes indicate that Steele noticed an increase in his back pain after his father-in-law, a chiropractor, worked on his back. (R. at 355-57) Doctors found a rib fracture and prescribed pain medication and a rib belt, but discharged Steele without admission. (R. at 355-57)

Consultative exams started in July 2011, the results of which are set forth below, but he had no treatment again until May 2012. Specifically, in that month, Steele went to the emergency room with complaints of back pain, but was not admitted. (R. at 421)

In June 2012, Steele presented to Dr. Amy Olin for a primary care consultation. (R. at 230, 433-34) Steele complained of pain in his right shoulder, neck and back, and

numbness in his right arm and weakness on the right side. (R. at 433-34) He also reported having social anxiety disorder, which was controlled with medication, and attention deficit disorder ("ADD"), for which Steele could not afford medication. (R. at 433-34) Upon examination, Steele had tenderness, but a normal range of motion, normal muscle tone, and normal coordination (R. at 433-34) His mood, affect, behavior, and thought content were also normal. (R. at 433-34) Dr. Olin assessed chronic neck, back and shoulder pain; social anxiety disorder, and ADD. (R. at 433-34) Dr. Olin refilled Steele's medications; but, she also encouraged Steele to exercise, lose weight, and possibly restart physical therapy. (R. at 433-34)

In August 2012, Dr. Olin noted a decrease in the range of motion of Steele's back with pain and spasm, but no deformity. (R. at 918-19) She noted normal psychiatric findings. (R. at 918-19) She prescribed several medications, including Vicodin, Klonopin, Tizanidine, and Tramadol. (R. at 229, 918-19) Dr. Olin also prescribed Steele a quad-base cane and a disability placard for his car. (R. at 233, 918-19) She further reinforced her recommendation that Steele exercise and lose weight. (R. at 918-19)

On March 8, 2013, Steele reported to Dr. Olin that his back pain remain unchanged. (R. at 921) He stated he was unable to afford surgery, and past physical therapy worsened the pain. (R. at 921). Upon examination, Dr. Olin observed the paraspinous area was tight and stiff. (R. at 922) Dr. Olin further observed that Steele was depressed. *Id.* Dr. Olin added situational mixed anxiety and depressive disorder as a diagnosis and continued Steele's Klonopin prescription. *Id.* Dr. Olin also continued his muscle relaxers for his back pain. *Id.*

On July 23, 2013, Steele's symptoms persisted; Dr. Olin added a physical therapy referral to his current pain medication regimen. (R. at 925)

At a visit to Dr. Olin in early January 2014, Steele complained of chronic pain, and asked to re-start Adderall for his ADD and decreased concentration. (R. at 928-29) Although Steele was using his cane, the visit was otherwise unremarkable. (R. at 928-29) Dr. Olin opined that Steele's concentration problem might be related to poor sleep. (R. at 928-29) Later that month, on January 28, 2014, Steele complained of increased pain after shoveling snow, but denied changes in pain patterns otherwise. (R. at 933-34) Upon examination, Steele's back was tender and he an antalgic gait with his cane, but no swelling, and normal muscle tone. (R. at 933-34) Dr. Olin observed that Steele had elevated liver function tests ("LFTs"), so she switched him to Oxycodone with Oxycontin. (R. at 934)

In February 2014, there was no significant change noted by Dr. Olin. (R. at 939-40) She again recommended exercise and losing weight. (R. at 939-40)

Steele returned to Dr. Olin on April 10, 2014, complaining of increasing numbness, tingling, and pain in his right wrist; right lower extremity weakness and shooting pains; and right upper extremity pain. (R. at 978) He also complained of back pain. (R. at 978) Steele reported that he had been "doing more, helping with sorting out a family house, [and] carrying his son." (R. at 934-44) On examination, Dr. Olin observed normal muscle tone, "4+/5" strength in the right upper and right lower extremities." (R. at 943-44, 978) Dr. Olin noted that Steele ambulated "with mild difficulty with [a] cane." (R. at 978) Dr. Olin referred Steele to a neurosurgeon, but noted he should do physical therapy if he was not a surgical candidate. (R. at 943-44)

Steele returned to Dr. Olin's office on May 17, 2014, complaining that his pain worsened with weather changes. (R. at 974) Dr. Olin again noted he still ambulated with a cane and was "[s]tiff in all movements," so she continued him on his pain medications. (R. at 974) Dr. Olin told Steele to continue his medications. (R. at 974-75)

In May 2014, Steele presented for another set of consultative examinations, the results of which are set forth below.

Steele saw Dr. Olin three times in the summer and fall of 2014, with no significant change in his symptoms and physical examinations. (R. at 992-93, 999-1000, 1002-03) Dr. Olin continued to stress medication, weight loss and walking more. (R. at 992-93, 999-1000, 1002-03)

In February 2015, Steele complained of more pain, but admitted that he was doing more child care because his wife's schedule had changed. (R. at 818-19) Steele still ambulated with a cane, but Dr. Olin noted no other abnormalities; she specifically stated that Steele's depression and anxiety were not issues. (R. at 818-19)

In July 2015, Steele presented for another round of consultative examinations, the results of which are recorded below.

On October 27, 2015, Dr. Olin observed decreased sensation in Steele's feet; she noted, "I am a little concerned that this may be from his back. . . . If worsening will refer for additional testing/ to neuro." (R. at 898) Otherwise, the examination was normal and Steele had mostly weaned of Klonopin for anxiety. (R. at 897-98)

Dr. Olin completed a physical residual functional capacity ("RFC") questionnaire on December 1, 2015. (R. at 905-08) Dr. Olin wrote that she had treated Steele every 3-4 months since June 2012. (R. at 905) Dr. Olin stated that Steele suffered from obstructive

sleep apnea ("OSA"), diabetes, hyperlipidemia, chronic low back pain, ADD, and hypertension. (R. at 905)  Dr. Olin stated his symptoms included chronic low back pain affecting gait, ability to sit and stand long periods, occasional dizziness, and fatigue. (R. at 905)  Dr. Olin described Steele's pain as constant moderate to severe low back pain radiating into the left leg, which was exacerbated by standing, sitting, and walking too long. (R. at 905)  Dr. Olin indicated the clinical findings included a stooped posture, and abnormal gait. (R. at 905)  Dr. Olin stated that Steele's anxiety and depression contributed to the severity of his symptoms and functional limitations. (R. at 906) Dr. Olin indicated that Steele's pain and other symptoms would constantly interfere with attention and concentration needed to perform simple work tasks, and he was incapable of even low stress jobs. (R. at 906)

Dr. Olin opined that Steele could walk up to a city block, sit for 15 minutes at one time, stand for 15 minutes at one time, sit for about 4 hours per workday, and stand/walk about 2 hours per workday. (R. at 906-07) Dr. Olin stated that Steele needed a job that allowed him to sit, stand, and walk at will throughout the day; specifically, he needed 5 minutes of walking, every 30 minutes. (R. at 907) Dr. Olin further stated that Steele would require about 15 minutes of unscheduled breaks for every hour of work. (R. at 907)  Dr. Olin also stated that Steele required a cane while standing and walking. (R. at 907)  Dr. Olin indicated that Steele was limited to lifting 10 pounds occasionally; looking down, looking up, and holding head in a static position occasionally; stooping rarely; and never twisting, crouching, climbing ladders, or climbing stairs. (R. at 908) Lastly, Dr. Olin opined that Steele would have "good days" and "bad days" and would be expected to miss more than four days per month.  (R. at 908)

In January 2016, Steele told Dr. Olin that he was doing okay with his pain and only complained of sleep issues. (R. at 1018) His examination was normal and Dr. Olin told him to continue with his current pain regimen. (R. at 1018)

## 2. Social Security Administration Consultative Exams

Steele participated in multiple consultative examinations between 2011 and 2015.

### a. Physical Examinations & Opinions

With respect to his physical health, the following was found:

On July 16, 2011, Steele presented to Dr. Ryan Whitesell for a consultative physical examination at the request of the Disability Determination Board ("DDB"). (R. at 371) Upon examination, Dr. Whitesell documented that Steele appeared "stable at station and [ ] comfortable in the seated position, however appears generally uncomfortable in the supine position." (R. at 371-372) He observed difficulty "bending over to attempt to footwear" and noted that "[f]orward flexion of the lumbosacral spine is limited to 60 degrees…. Lateral bend is limited to 15 degrees bilaterally. Straight leg raises are positive bilaterally in the supine position." (R. at 372) Dr. Whitesell made note of mild tenderness to palpation over Steele's right shoulder, limited adduction of the left shoulder, difficulty with walking on the heels or tandem walking, diminished motor strength in the right lower extremity, and diminished grip strength (3/5) in the right hand. (R. at 373, 378) Dr. Whitesell wrote:

> The claimant should have the ability to sit comfortably throughout an eight hour workday with breaks. Postural limitations include bending, stooping, crouching, kneeling, crawling. The claimant has difficulty lifting anything greater than 10 pounds in his right hand.

(R. at 373)

Also in July 2011, state agency reviewing physician, R. Fife, M.D., opined that Steele could perform light work, but could never climb ropes, ladders, or scaffolds, and could climb ramps and stairs, balance, kneel, stoop, crouch, and crawl only occasionally. (R. at 379-86) Further, Dr. Fife opined that Steele could reach with either arm occasionally, handle with his right arm occasionally, but with his left arm constantly, and constantly finger and feel with both hands and arms. (R. at 379-86) He stated that Steele should avoid concentrated exposure to hazards such as machinery and heights. (R. at 379-86)

In November 2011, state agency reviewing physician J. Sands, M.D., affirmed Dr. Fife's opinion. (R. at 412).

On May 24, 2014, Steele presented to Dr. Andrew Koerber for a DDB-ordered consultative examination. (R. at 954-61) He reported his ongoing neck pain, which worsened 8 years prior. (R. at 954) Steele stated that the previous epidural injections never alleviated his symptoms for more than few days. *Id.* He also reported a worsening shoulder injury, which was exacerbated by lifting his arm and holding objects. (R. at 955)

Dr. Koerber observed Steele was unable to walk normally without his cane or without holding onto the wall. (R. at 957) Dr. Koerber observed 4/5 grip strength in his right hand, decreased sensation in his right upper extremity, inability to tandem walk without holding onto a wall, inability to do heel-to-toe without the cane, and inability to do a knee squat. (R. at 958) Further, Dr. Koerber observed Steele demonstrated decreased range of motion: lumbar forward flexion was limited to 30 degrees, lumbar extension was limited to 10 degrees, right shoulder abduction was limited to 100 degrees, and bilateral

shoulder forward elevation was limited to 115 degrees. (R. at 961) Dr. Koerber noted that

Steele exhibited pain during the lumbar spine and shoulder exam. *Id.*

Dr. Koerber provided the following medical source statement:

. . . Mr. Steele has the ability to perform activities involving sitting, standing, moving about for short periods (for no more than 30 min. at any one time or more than 2 hours total in an 8 hour work day), lifting/carrying objects lighter than 10 pounds, handling objects with both hands (including writing, zipping, buttoning, and picking up small objects), hearing, and speaking. With findings on physical examination as detailed above, it would be reasonably expected that Mr. Steele would have difficulty performing activities involving moving about for long periods (for no more than 30 min. at any one time or more than 2 hours total in an 8 hour work day), lifting/carrying objects heavier than 10 pounds, or kneeling/squatting. He does use a cane for assistance with ambulation, which was prescribed by a physician. He did have the cane at today's exam, and it does appear to be medically necessary. He did demonstrate evidence of neurologic deficit with grip strength being 4/5 in his right hand. He did not demonstrate evidence of reflex abnormality. He does have decreased sensation in his right upper extremity. Sensation is normal in his right lower extremity. He demonstrates motor dysfunction as evidenced by decreased range of motion of his lumbar spine and his right greater than left shoulder. He has a slow and cautious pace without his cane. His pace improves to normal with the cane. He cannot do a tandem walk unless he holds onto the wall. He can only do a heel walk if he uses his cane. He is not able to do a toe walk at all. He cannot do a knee squat. He has the ability to hear and understand normal conversational speech. He has normal gross manipulation and 5/5 grip strength in his left hand. He has 4/5 grip strength in his right hand, but he has normal finger opposition and adduction in both hands. He is able to pick up small objects without difficulties using both hands. His handwriting is legible. He demonstrates normal goal-oriented activity as evidenced by his ability to show up for today's appointment on time.

(R. at 959)

On July 7, 2015, Steele presented to Dr. Kumpol Dennsion for a DDB-ordered

consultative examination. (R. at 781-90) Dr. Dennison observed, "[Steele was] in distress

in dealing with pain, ambulates with cane and has abnormal posture due to chronic back

problem." (R. at 782) Dr. Dennison further observed, "He cannot ambulate without cane

in the room. He has significant difficulty getting on and off the examination table. He cannot lie flat on bed." (R. at 782)

Dr. Dennison noted that Steele exhibited weakness in his right upper and lower extremities, decreased sensation of the right toe, he was unable to kneel, squat, and heel to toe, and could not walk without his cane. (R. at 782) Steele exhibited the following decreased range of motion: lumbar forward flexion was limited to 40 degrees, with pain; lumbar lateral extension was limited to 20 degrees, with pain; lumbar left lateral flexion was 20 degrees, with pain; shoulder abduction was limited to 130 degrees bilaterally; right lower hip abduction was limited to 20 degrees; hip flexion was limited to 45 degrees bilaterally; ankle dorsiflexion was limited to 5 degrees bilaterally, with pain; and right ankle plantar flexion was limited to 30 degrees, with pain. (R. at 794)

Dr. Dennison's diagnostic impression was "1. Chronic back pain, neck pain, osteoarthritis of motor and sensory function of the right upper and lower extremities, chronic pain of arthritic spine. 2. Diabetes mellitus. 3. Social anxiety disorder." (R. at 782)

Dr. Dennison concluded:

The claimant is physically disabled, unable to care for himself with daily life activity such as shower and bath. He cannot do shopping or cleaning. He requires narcotic for pain management of chronic arthritic back pain. Additionally, he is taking Invokana for his diabetes mellitus. He has medical allergy to [M]etformin. He has no hearing and speech disability. He demonstrates normal goal-oriented activity as evidenced by his ability to show up for today's appointment on time.

(R. at 783.)

Dr. Dennison further supplied a medical source statement of Steele's physical ability to perform work-related activities. (R. at 785) Dr. Dennison stated that Steele was limited to "occasionally" lifting up to 10 pounds and carrying up to 10 pounds. (R. at 785)

Dr. Dennison indicated that Steele could, at one time without interruption, sit for 15 minutes, stand for 5 minutes, and walk for 15 minutes. (R. at 786) Dr. Dennison indicated Steele could, in an eight hour workday sit for 2 hours, stand for 1 hour, and walk for 1 hour. (R. at 786) Dr. Dennison stated Steele required the use of a cane to ambulate. (R. at 786) Dr. Dennison opined the cane was medically necessary, and that Steele was only able to walk a half block without the cane, and was unable to use his free hand to carry small objects. (R. at 786) Dr. Dennison stated that Steele was further limited to occasionally reaching with his right hand; occasionally reaching and handling with his left hand; and never pushing/pulling with both hands. (R. at 787)

Dr. Dennison also explained Steele's limitations due to his significant limitation of lumbar flexion and extension. (R. at 787) Dr. Dennison stated Steele was limited to never operating foot controls. (R. at 787) Dr. Dennison stated that Steele was further limited to occasionally climbing stairs and ramps, and crawling; and never climbing ladders or scaffolds, balance, stoop, kneel, and crouch. (R. at 788) Dr. Dennison opined that Steele was limited to occasional exposure to extreme temperatures, and should never be exposed to unprotected heights, moving mechanical parts, and operating a motor vehicle. (R. at 789) Dr. Dennison further explained Steele's need for the cane to ambulate, the occasional need for a back brace, and the use of prescription narcotics for pain control accounted for the limitations. (R. at 789)

Based on physical impairments, Dr. Dennison stated that Steele would be unable to travel without a companion for assistance, ambulate without an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, use standard public

transportation, prepare a simple meal and feed himself, and care for personal hygiene. (R. at 790)

### b. Mental Health Examinations & Opinions

With respect to mental impairments, the following was found:

In July 2011, state agency reviewing psychologist Joseph A. Pressner, Ph.D., opined that Steele had mild limitations in activities of daily living; moderate limitations in maintaining social functioning and concentration, persistence, or pace; and experienced no episodes of decompensation. (R. at 404) Dr. Pressner stated that Steele also had moderate limitations in his ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; and travel in unfamiliar places or use public transportation. (R. at 408-10) He further opined that Steele had markedly limited ability to interact appropriately with the public. (R. at 408-10) Dr. Pressner translated these limitations into his opinion that Steele could understand, remember, and carry out simple tasks; relate on at least a superficial, ongoing basis with coworkers and supervisors; attend to tasks for sufficient periods of time to complete them; and manage the stresses involved with simple work. (R. at 408-10)

Steele presented to Dr. Nicole Leisgang for a consultative psychological examination at the request of the DDB on August 3, 2011. (R. at 389) Steele described what Dr. Leisang referred to as "panic-like symptomatology along with a sense of impending doom." (R. at 391) Dr. Leisgang noted that Steele appeared to be anxious ("sighed occasionally as if to calm himself"), tended to ramble, displayed noticeable facial flushing and fidgeting, and "was generally tense." (R. at 391) Dr. Leisgang felt that "[h]e

did not appear to exaggerate or minimize his difficulties. . . [h]is presentation was consistent with his comments. He did appear to be anxious and uncomfortable interacting with this examiner." (R. at 392) The examiner diagnosed social anxiety disorder and assessed a current GAF[2] score of 50, indicating a "[s]erious [s]ymptomatology." *Id.* (R. at 393)

In November 2011, state agency reviewing psychologist William A. Shipley, Ph.D., affirmed reviewing physician Dr. Pressner's opinions. (R. at 413)

Steele presented to Suzanne Leiphart, PhD, HSPP, for a DDB-ordered psychological evaluation on May 30, 2014. (R. at 962-67) Steele recounted headaches, right arm numbness and pain, and shoulder pain following his forklift accident. (R. at 962) He reported anxiety and took Clonazepam as needed. (R. at 964) Without the Clonazepam, he stated, "I'd feel panicky like I would want to get out away from the situation. It's not that it cures it…. Don't remember if it was that way before…. Was anxious at school. I wasn't like a popular kid. I always felt different anyways." (R. at 964)

Dr. Leiphart noted, "The claimant's mood was depressed and anxious at times, and affect was appropriate to mood. Feelings of hopelessness at times, helplessness and low self esteem [sic] were reported by claimant along with pain, anxiety and problems sleeping." (R. at 964) He reported that he had poor interpersonal relations: "I wrote a

---

[2] "GAF" stands for Global Assessment of Functioning. The GAF scale reflects a "clinician's judgment" of the individual's symptom severity or level of functioning. Am. Psychiatric Ass'n, *Diagnostice & Statistical manual of Mental Disorders*, 32-34 (4th ed., Text Rev. 2000) (DSM-IV-TR). An overall GAF score is dependent upon separate assessments of (1) symptom severity, and (2) social, occupational, and school functioning. *Id.* A GAF score of 50 falls into the 41-50 range, which is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." *Id.*

letter saying I didn't want to be [a Jehovah's Witness]. Everyone I know disowned me. . . . Everybody I've known since I was a baby…my mother...It's upsetting. . . . They shun people like the Amish. They'll be in trouble if they talk to me." (R. at 965)

Dr. Leiphart assessed anxiety disorder and depressive disorder, stated that psychosocial stressors included loss of friends and family, and assessed a GAF score of 53. (R. at 965)

On July 24, 2015, Steele presented to Meridian Psychological Associates for a DDB-ordered consultative examination by Jason Hankee, Psy.D, HSPP. (R. at 791) Steele recounted his "not good" childhood, that his father was abusive and his mother forced him to attend "cult"-like religious meetings. (R. at 791)  Steele stated he dropped out of high school in the 11th grade. (R. at 791)  He recalled being thrown from a forklift while at work in 2007 or 2008 and hitting his head, but was never tested or treated for head injuries. (R. at 791)  He explained this incident caused his back and shoulder injuries. (R. at 791)  Steele reported social anxiety, with the following symptoms: discomfort in groups of people, rapid heartbeat, sweatiness, and avoidance of people. (R. at 791)  He also reported a history of untreated ADD. (R. at 792) Steele stated he relied on his wife for most activities of daily living, including personal hygiene, cleaning, cooking, laundry, and grocery shopping. (R. at 791)

Dr. Hankee assessed Social Anxiety Disorder and, from history, Inattentive ADHD. (R. at 793) Dr. Hankee further concluded:

> Mr. Steele is a 34-year-old, married, Caucasian male referred for psychological evaluation by the Social Security Disability Determination Bureau. Disability is being claimed due to "back injury, shoulder injury, Social Anxiety Disorder, arthritis, ADD, Social Anxiety Disorder, hearing loss." Mr. Steele reported a work related injury that involved him being thrown from a forklift around 2007 or 2008 from which he sustained injuries

to his back and shoulder. He stated that he also experiences social anxiety and prefers to be alone but does work hard to be polite and cooperative in these settings despite the marked anxiety he experiences. He also reported a history of ADD. He now takes Klonopin [twice daily] and roughly ten other medications for his health problems. A previous Disability Evaluation from 2011 documented Social Anxiety Disorder and ADHD, Inattentive Type.

(R. at 793) Dr. Hankee stated that Steele had moderate limitations in understanding and remembering complex instructions, carrying out complex instructions, and with the ability to make judgments on complex work-related decisions. (R. at 796) Dr. Hankee asserted that Steele had moderate limitations with interacting appropriately with the public, interacting appropriately with supervisors, interacting appropriately with coworkers, and responding appropriate to usual work situations and to changes in a routine work setting. (R. at 796)

### D. EXPERT TESTIMONY

At the first hearing, held on September 26, 2012, Dr. Cools, a board certified psychologist and medical expert, testified that Steele's problems were mostly physical, but he did have diagnoses of anxiety and ADD; was taking Klonopin; and had no mental health treatment. (R. at 50-51) He noted that Steele's mental impairments did not meet or medically equal a listed impairment and that Steele had no limitations in his ability to complete activities of daily living; moderate limitations in maintaining social functioning; mild limitations in maintaining concentration, persistence, or pace; and experienced no episodes of decompensation (R. at 54)

Dr. Cools further opined that Steele should have little or no contact with the public; had no difficulty relating to coworkers and supervisors who were familiar to him; could sustain an adequate attitude at work; could accept supervision, accept routine criticism for a job-related function, and was able to understand, learn, and remember simple, semi-

skilled tasks and perform such tasks with adequate concentration, pace, and persistence (R. at 55) Dr. Cools noted that his opinion did not consider Plaintiff's pain, only his mental symptoms (R. at 55)

On March 18, 2016, at the second hearing, Steele; his attorney; the ALJ; a VE, George Parson; and two medical experts, Dr. John Pella, and Dr. James Brooks; were present. (R. at 485-520)

Dr. Pella testified first and described Steele's impairments in the record. (R. at 488-90) Dr. Pella is board-certified in internal medicine and pulmonary disease. (R. at 869-73) Dr. Pella asserted that Steele's impairments did not meet or equal any physical listing. (R. at 490) Dr. Pella proffered the following limitations:

> I would limit him to 10 pounds frequently, lift and carry. Sitting up to two hours at a time, six hours in an eight hour day with a sit stand option. Five minutes on the hour should be adequate. Standing a half hour to an hour at a time, up to three hours in an eight hour day. Walking up to a half hour at a time, would be three hours in an eight hour day. The examiners seem to feel that a cane was medically necessary. With regard to reaching overhead and push/pull, I'll limit that to occasionally bilaterally, pull and reaching frequently. No problems with handling, fingering, or feeling. I'll limit the repetitive firm grasping on the right to occasional. No problems the left side. I do not know what hand dominance he is. With regard to the . . . right lower extremity, I'll limit that to occasional, left side to frequent. No ladders or scaffolds, stairs with a handrail. Balance occasionally, stoop occasionally, kneel occasionally with no crouching or crawling. No unprotected heights. Moving mechanical parts frequently. No commercial driving. No extreme heat or cold.

(R. at 490-91)

Next, Dr. Brooks, a board-certified psychologist, testified to Steele's psychological conditions. (R. at 492-94, 868) Dr. Brooks stated that Steele's activities of daily living limitations were "mild," his social functioning limitations were "moderate," and his cognitive function was "mild." (R. at 493-94) Dr. Brooks opined that Steele did not meet

or equal any listing. (R. at 494)  Dr. Brooks highlighted a mental RFC and stated, "Under the B criteria, and I'm not factoring in his medical condition here, only the psychological, activities of daily living would be mild. Social functioning moderate; cognitive functioning mild."  (R. at 494)  As a functional limitation, Dr. Brooks proffered, "He should have only occasional contact with supervisors, coworkers, and general public." (R. at 494)

After Steele's testimony, the VE testified.  Specifically, the VE testified that Steele's past relevant work included work as a security officer: light work and semi-skilled with an SVP[3] of 3. (R. at 513) The ALJ then posed the following hypothetical:

> First, please assume a hypothetical individual with the age of 35 years, with a limited education, past relevant work as you just described, and restrictions as follows. Limited to frequently lifting and carrying 10 pounds. Sitting can be accomplished two hours at a time, six hours per eight hour work day, with a sit stand option for five minutes at the workplace. Walking and standing combined would be approximately half an hour at a time, total of less than six in an eight hour work day. A cane is medically necessary, however. Overhead and push/pull are limited to occasional. Forward reaching is limited to frequent. Repetitive firm grasping on the right is limited to occasional. Use of the right lower extremity is limited to occasional. But the left lower extremity can be used frequently. There's no climbing of ladders, ropes, or scaffolds. Stairs must be climbed with a handrail. Occasional balancing, stooping, and kneeling. No crouching or crawling or working at unprotected heights. Moving mechanical parts can be accessed frequently. There is no commercial driving and no extremes of heat or cold. And lastly, any work must require only occasional contact with the general public, coworkers, and supervisors.

(R. at 514-15) The VE opined that the only job available in the national economy was as a security monitor, SVP 2, with 550 positions in Indiana, and 25,000 in the national economy. (R. at 515) The VE stated that he obtained the numbers from the fourth quarter

---

[3] "SVP" is Specific Vocational Preparation and "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." http://www.occupationalinfo.org/appendxc_1.html, last visited Aug. 15, 2017.

of 2015 Occupational Outlook Quarterly. (R. at 517) The VE testified that the security monitor position was defined as sedentary work with an SVP of 2. (R. at 515) The VE also detailed the occasional reaching limitation precluded other jobs. (R. at 515)

Then, the ALJ added a limitation of needing to stand from a sitting position every 15 to 20 minutes, and the VE testified that this limitation would preclude all competitive employment. (R. at 516) The VE opined, "I think that restriction alone would make it difficult for him to accomplish anything in even a sedentary position." (R. at 516) The VE lastly opined that a person who used a cane in one hand and was unable to lift up to 10 pounds in another was, by definition, restricted to less than sedentary work. (R. at 518-19)

### E.  POST-HEARING EVIDENCE FROM PLAINTIFF

After the hearing, Plaintiff's counsel submitted a post-hearing contention demonstrating that the job of surveillance systems monitor was last updated in the Dictionary of Occupational Titles ("DOT") in 1986. He further submitted an O*NET[4] Crosswalk Search that indicated the DOT number for surveillance systems monitor correlates with different occupations in the modern economy: Retail Loss Prevention Specialists, Gaming Surveillance Officers, and Gaming Investigators. These jobs have an SVP of 4-6, representing semiskilled and skilled work which requires three months to two years to learn. DOT Appendix C (II).

---

[4] "The O*NET program is the nation's primary source of occupational information. Central to the project is the O*NET database, containing information on hundreds of standardized and occupation-specific descriptors. The database, which is available to the public at no cost, is continually updated by surveying a broad range of workers from each occupation. Information from this database forms the heart of O*NET OnLine, an interactive application for exploring and searching occupations." www.onetcenter.org/overview.html, last visited Aug. 15, 2017.

## F. RELEVANT ASPECTS OF THE ALJ'S DECISION

On May 11, 2016, the ALJ issued an unfavorable decision. (R. at 437-84) At Step I, the ALJ concluded that Steele had not engaged in substantial gainful activity since February 1, 2010, the alleged onset date. (R. at 443)

At Step II, the ALJ concluded that Steele suffered from the following severe impairments: lumbar spine arthritis and lumbosacral spondylosis; chronic neck pain; right shoulder pain associated with osteoarthritis; rotator cuff injury; right carpal tunnel syndrome; osteoarthritis and peripheral neuropathy of the lower extremities; obesity; hypertension; type II diabetes; sleep apnea; and an anxiety disorder. (R. at 443-44)

At the first half of Step III, the ALJ determined that Steele did not have any impairment or combination of impairments that met or equaled the severity of any listed impairment. (R. at 444-56) At the second half of Step III, the ALJ found that Steele retained the capacity to perform "sedentary work" as defined, with the following limitations:

> [Steele] can lift, and carry 10 pounds frequently but no additional weight occasionally. He can sit for two hours at a time and for a total of six hours in an eight-hour workday. He can stand for one-half hour to one hour at a time and for a total of three hours in a workday. He can walk for thirty minutes at a time and for a total of two hours in a workday. [Steele] should be provided a sit/stand option for 5 minutes every hour. A cane is medically necessary. [Steele] can push, pull, and reach overhead bilaterally on an occasional basis. He can reach forward frequently. He has no limitations in handling, fingering, or feeling with either upper extremity. He can perform repetitive grasping on the right side occasionally, and he has no limitations in using his left upper extremity. [Steele] can use his right lower extremity for pushing and pulling controls occasionally, and he can use his left lower extremity for pushing and pulling controls frequently. He should not climb ladders or scaffolds. He should use a handrail when climbing stairs. The claimant should never crouch or crawl. He should limit to an occasional basis his kneeling, balancing, and stooping. He should never work at unprotected heights or around extreme cold or extreme heat. He may work around moving mechanical parts frequently. He should not perform

commercial driving. He should limit his contact with co-workers, supervisors, and the general public to an occasional basis.

(R. at 456-57) The ALJ largely relied upon Dr. Pella's opinions, rejecting virtually any testimony that was inconsistent therewith. (R. at 456-74)

At Step IV, the ALJ concluded that Steele was unable to perform his past relevant work. (R. at 474)

At Step V, based on the VE's testimony, the ALJ concluded that Steele retained the ability to perform the job as security monitor. (R. at 475-76) Steele's claim for benefits was denied based upon this Step V finding. (R. at 475-76)

## II. <u>STANDARD</u>

To be eligible for SSI, a claimant must have a disability under 42 U.S.C. § 1382c(a)(3)(A). "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 416.202:

I.     If the claimant is employed in substantial gainful activity, the claimant is not disabled.

II.    If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III.   If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

IV.    If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

V.      If the claimant can perform other work given the claimant's residual
        functional capacity, age, education, and experience, the claimant is
        not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the

Commissioner at the fifth step.  *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d

386, 389 (7th Cir. 1992).

        The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review

of the Commissioner's denial of benefits.  When the Appeals Council denies review of the

ALJ's findings, they become the findings of the Commissioner.  *See Craft v. Astrue*, 539

F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

This Court will sustain the ALJ's findings if they are supported by substantial evidence.

*See* 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234

(7th Cir. 1999).  "Substantial evidence is 'such evidence as a reasonable mind might

accept as adequate to support a conclusion.'"  *Craft*, 539 F.3d at 673 (quoting *Barnett v.

Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).  In reviewing the ALJ's findings, the Court

may not decide the facts anew, reweigh the evidence, or substitute its judgment for that

of the ALJ.  *Nelson*, 131 F.3d at 1234.

        Further, the ALJ "need not evaluate in writing every piece of testimony and

evidence submitted."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However,

the "ALJ's decision must be based upon consideration of all the relevant evidence."

*Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  *See also*, *Craft*, 539 F.3d at 673.  In

addition, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion,

but must articulate, at some minimum level, his analysis of the evidence to allow the

[Court] to trace the path of his reasoning."  *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir.

1995).  *See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))).  An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review."  *Craft*, 539 F.3d at 673.

### III.  ANALYSIS

The focus of Steele's arguments is on the ALJ's assessment of his RFC in the latter-half of Step III and his subsequent failure to address Steele's evidence that the sole job opportunity identified by the VE actually no longer exists as the VE described it.  With respect to his RFC, Steele contends that the ALJ erred when he misstated Dr. Pella's testimony regarding Steele's ability to use his cane in his right hand and, alternatively, carry something in his right hand while using the cane with his left one.  The Court agrees that the ALJ's RFC assessment is unsupported by the evidence because it is internally inconsistent with respect to Steele's ability to grasp firmly with his right hand.  Specifically, like Dr. Pella's opinion, the ALJ stated that Steele could frequently lift or carry 10 pounds with either hand.  (R. at 456 & 490)  However, the ALJ later assessed that Steele could "perform repetitive grasping on the right side occasionally . . . ."  (R. at 457; *see also* R. at 490 (Dr. Pella's opinion))  Although the Government argues that the ALJ relied upon Dr. Olin's opinion in reaching his conclusions about how much Steele could lift and carry with either hand, Dr. Olin's opinion is to the contrary:  she opined that Steele was limited to lifting 10 pounds occasionally.  (R. at 908)  In addition, at least two consultative examiners opined that Steele had difficulty or could not lift or carry anything more than 10

pounds.  (R. at 373, Dr. Whitesell's opinions; R. at 959, Dr. Koerber's opinion; R. at 785 & 786, Dr. Dennison's opinion that Steele was unable to carry objects with his free hand when using his cane)  The Court is unable to trace the path of the ALJ's reasoning with respect to this point because he relies almost exclusively on Dr. Pella, who provided no explanation for how he determined the relevant limitations.  (R. at 488-91)  Further, the ALJ provides only cursory reasons for why he found Dr. Pella's conclusions more compelling than those of the treating and examining physicians; therefore, the Court cannot meaningfully review this aspect of the ALJ's decision..

Moreover, the ALJ failed to consider the effect of Steele's pain on his ability to concentrate or persist in work activities when he determined Steele's RFC.  Each of the psychological examiners specifically limited their findings with respect to Steele's ability to concentrate, persist or maintain pace, on his mental capacity; each eschewed consideration of his physical issues.  (R. at 410 (Dr. Pressner remarking that Steele's "pace would be within normal limits except as limited by [his] physical problems"); R. at 393 (Dr. Leisgang stating that Steele had a history of ADD, inattentive type); R. at 796 (Dr. Hankee discussing Steele's moderate limitations regarding work-related tasks); R. at 55 (Dr. Cools' testimony stating that his opinion did not consider Steele's pain); R. at 494 (Dr. Brooks stating, "I'm not factoring in his medical condition here, only the psychological"))  Further, the ALJ inaccurately implied that Dr. Cools considered Steele's pain when evaluating the effect of his limitations.  (R. at 469, implying that Dr. Cools had accounted for Steele's pain when assessing his limitation in concentration, persistence and pace)  Dr. Cools clearly stated he did not consider the effects of Steele's pain in his assessment.  (R. at 55)  Further, the psychological examiners were not the only ones to

provide an opinion regarding the effect of Steele's impairments on his ability to concentrate. Dr. Olin specifically stated that Steele would have difficulty concentrating because of his pain and other symptoms. (R. at 906) Again, the Court cannot conclude on this record that the ALJ assessed this statement or statements by other examining physicians regarding Steele's pain and the effect it might have on his ability to concentrate or perform work-related tasks. For these reasons, there is no logical and accurate bridge between the evidence and the ALJ's conclusions with respect to Steele's limitation in concentration, persistence and pace. *See Craft*, 539F.3d at 673.

This problem was compounded when the ALJ failed to account for any limitation on Steele's concentration, persistence and pace when he posed a hypothetical to the VE, even those mild and/or moderate ones discussed by the two testifying psychological experts. (R. at 456-57) This error is critical in light of the Social Security Regulations that require the ALJ to include all limitations and restrictions caused by any of a claimants impairments in making a determination of an RFC. *See* SSR 96-8p; *Clifford v. Apfel*, 227 F.3d 863, 873-74 (7th Cir. 2000). Again, there is no explanation for why the ALJ left out this limitation.

Finally, the ALJ completely ignored Steele's post-hearing evidence that called into question the soundness of the VE's opinion regarding the availability of suitable work for a hypothetical person with Steele's limitations. Although the ALJ had discretion to decide whether or not to re-open the record based on evidence submitted after the hearing, *see see McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (citing 20 C.F.R. § 404.944); here, the Commissioner argued the merits of the evidence in response to Steele's petition. *See* Dkt. No. 22 at 30-31. Not only does this violate the *Chenery* doctrine, *see*

*SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943), the Commissioner's argument failed to consider that the ALJ's RFC did not account for the mental capacity limitations in the record. Although those limitations were mild as testified to by both psychological experts, if the ALJ had included them in the RFC, Steele's post-hearing evidence that a surveillance monitor requires further training could have made a difference in the VE's recommendation. This is not a case in which the VE testified that there were multiple jobs available to a hypothetical person with the stated limitations; rather, there was a single job. Coupled with the other errors made by the ALJ regarding his RFC analysis, the ALJ's failure to even mention the after-hearing evidence requires remand.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Court **REMANDS** this matter to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g).

On remand, the ALJ should consider the ability of Claimant Michael Steele to use his right hand either to use a cane while carrying 10 pounds or carry 10 pounds while using the cane in his left hand. The ALJ should also consider Claimant Michael Steele's allegations of and the record evidence that pain may affect his ability to concentrate. Further, the ALJ should also account for the psychological evidence in determining Claimant Michael Steele's residual functional capacity. Finally, the ALJ may also wish to consider evidence that the Dictionary of Occupational Titles information is outdated and that certain jobs in the national economy have evolved such that the skill level required for the modern job is higher than that for the originally-evaluated position. The Court will

enter judgment accordingly.

IT IS SO ORDERED this 18th day of August, 2017.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana




Distribution:

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Nicholas Thomas Lavella
KELLER & KELLER
nlavella@2keller.com

Matthew Frederick Richter
KELLER & KELLER LLP
mrichter@2keller.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov